# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| BANK OF BREWTON, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    CIVIL ACTION 13-0176-WS-B |
| | ) |
| THE TRAVELERS COMPANIES, INC., | ) |
| et al., | ) |
| | ) |
|     Defendants. | ) |

## ORDER

This matter is before the Court on the defendants' motion for summary judgment and on the plaintiff's motion for relief under Rule 56(h). (Docs. 49, 64). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 50-52, 56-57, 61-62, 64, 67-68), and the motions are ripe for resolution. After careful consideration, the Court concludes that the defendants' motion is due to be granted and the plaintiff's motion denied.

## BACKGROUND[1]

The plaintiff ("the Bank") was at all relevant times covered under a financial institution bond ("the Bond") issued by the defendants. As relevant here, the Bond provides that the underwriter "agrees to indemnify the Insured for … [l]oss resulting directly from the Insured having, in good faith, for its own account or for the account of others … extended credit … on the faith of any item listed in (a)(i) through (a)(iv) above [including a "Certificated Security"], which is a Counterfeit." (Doc. 52, Exhibit A at 5, 7-8). "Counterfeit means an imitation which is intended to deceive and to be taken as an original." (*Id*. at 15).

---

[1] Most of the facts recounted herein are taken from the plaintiff's version; the balance come from the defendants but are unchallenged by the plaintiff.

Over a period of years, the Bank made a number of loans to Jackson Hines and certain businesses (collectively, "Hines"). Over time, these loans began to be consolidated and renewed. In 2005, Hines assigned the Bank 180 shares in The Securance Group ("TSG") as security and delivered to the Bank a stock certificate reflecting these shares ("Certificate No. 2"). (Doc. 56 at 5). At some point, Hines delivered to the Bank a second stock certificate reflecting an additional 180 shares in TSG ("Certificate No. 7"). In March 2009, a Bank employee compared the two certificates and realized that Certificate No. 2 was not an original stock certificate but a color copy of the original. (*Id*. at 6).

When approached, Hines told the Bank he had mistakenly given the Bank a copy rather than the original of Certificate No. 2 and that he had since lost the original. Hines advised TSG he had lost the original of Certificate No. 2 and asserted he had not pledged or encumbered Certificate No. 2 other than with the Bank. (Doc. 56 at 6; Plaintiff's Exhibit 13). TSG issued a replacement certificate ("Certificate No. 11"), which the Bank received in April 2009. (Doc. 56 at 6).

In December 2009, Hines executed a promissory note in favor of the Bank in the principal amount of approximately $1.5 million. This represented a renewal of several prior loans to Hines. Another note of approximately $95,000, was executed to cover fees associated with the larger transaction. The Bank would not have entered these transactions absent the entirety of the collateral, including the 360 shares of TSG. (Doc. 56 at 4).

In April 2010, the Bank discovered that Hines had actually pledged the original of Certificate No. 2 to another bank in 2007. This rendered replacement Certificate No. 11 null and void, since it represented the same shares as Certificate No. 2. Hines failed to replace the 180 shares with other collateral, defaulted on the December 2009 loans, and filed for bankruptcy. (Doc. 56 at 6-7). The Bank promptly submitted a proof of loss to the defendants, but they have not paid the Bank's claim.

The complaint asserts claims for breach of contract and bad faith. (Doc. 17 at 41-42). The defendants seek summary judgment as to both claims.

**DISCUSSION**

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address

3

another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

**I. Breach of Contract.**

In order to prevail on this claim, the Bank's loss must have resulted directly from its conduct in extending credit, in good faith, on the faith of a counterfeit stock certificate. There are two candidates: Certificate No. 2 and Certificate No. 11.[2]

**A. Certificate No. 2.**

Certificate No. 2 cannot support the Bank's claim because, even if it is a "counterfeit" as defined by the Bond, the Bank suffered no loss resulting directly from having relied (or having relied in good faith) on that certificate as a genuine original document. As the Bank repeatedly insists, its only loss occurred in connection with the December 2009 loans. (Doc. 56 at 15, 23, 24, 26, 29). As of April 2009, the Bank knew that Certificate No. 2 was a copy, not an original. (Nall Affidavit at 2). Moreover, in April 2009 the Bank announced that it "considers Certificate #2 null and void and releases Certificate #2 and accepts Certificate #11 as collateral on [Hines's] current debts." (Doc. 52, Exhibits K, M).[3] As the defendants correctly note, (Doc. 61 at 2), after April 2009 the Bank

---

[2] The Bank concedes that Certificate No. 7 is not counterfeit. (Doc. 56 at 7 n.7).

[3] "The Bank's practices require physical possession of a stock certificate used as collateral for a loan," (Nall Affidavit at 2), because "[a] copy of a stock certificate would not constitute an assignment …." (Doc. 56 at 20). Thus, once the Bank knew that Certificate No. 2 was a copy, it also knew the certificate was worthless.

4

could not possibly have relied in good faith on Certificate No. 2 in extending credit to Hines.[4] The Bank agrees, insisting that all of the defendants' arguments concerning Certificate No. 2 are "irrelevant." (Doc. 56 at 28 & n.17).

**B. Certificate No. 11.**

Certificate No. 11 cannot support the Bank's claim because it is not "counterfeit" within the contemplation of the Bond. As noted, "[c]ounterfeit means an imitation which is intended to deceive and to be taken as an original." (Doc. 52, Exhibit A at 15). The Bank insists that Certificate No. 11 is an "imitation" of Certificate No. 2 because it "simulate[d]" Certificate No. 2 and "purported to be" Certificate No. 2. (Doc. 56 at 18; Doc. 67 at 3-4). The Bank is plainly incorrect.

Certificate No. 11 is certainly similar to Certificate No. 2. (Doc. 52, Exhibit U). It has the same emblem, the same border, and the same pre-printed language as Certificate No. 2 (as presumably do all stock certificates of TSG).[5] Both certificates fill in the blanks for owner and number of shares with the words, "Jack W. Hines, Jr." and "One hundred eighty," respectively.

But there are important and obvious differences as well. First, Certificate No. 2 is dated December 6, 2004, while Certificate No. 11 is dated April 6, 2009. Second, the name and signature of TSG's president are different. Third, the name and signature of its secretary-treasurer are different. Finally, and definitively, the prominently displayed certificate number is different: Certificate No. 2 announces that it is number "2," while Certificate No. 11 states that it is number "11."

---

[4] *First National Bank v. Cincinnati Insurance Co.*, 2005 WL 2460719 at *4 (E.D. Wis. 2005) (to satisfy the "good faith" requirement, "the bank must have relied on the document at issue without any inside knowledge of its falsity or any incentive to act on it knowing it was false").

[5] It presumably has the same color as well but, since the parties provided only black-and-white photocopies, the Court cannot verify this similarity.

In light of these uncontroverted facts, the Bank's suggestion that Certificate No. 11 purports to be the original of Certificate No. 2 is untenable. Certificate No. 11 purports to be precisely what it says it is: Certificate No. 11. The Bank – which still had a copy of Certificate No. 2 in its possession for comparison, (Nall Affidavit at 2); which understood that the original Certificate No. 2 was lost; which had expressly declared Certificate No. 2 null and void; which considered Certificate No. 11 a "replacement" for Certificate No. 2, (*id*.); and which had expressly released Certificate No. 2 in exchange for Certificate No. 11 – could not possibly have believed that Certificate No. 11 was really the long-lost original of Certificate No. 2. Notably, the Bank does not assert that it harbored such a belief, and any such assertion would be ludicrous.[6]

The Bank's problem is fatal because, in order to be a counterfeit under the Bond, a document must be a fake version of an existing, genuine document, and it must possess sufficient similarity to the original to render it plausible that it is the genuine original of that which it imitates. The "consistent line of authority" among the "[n]umerous other courts [that] have interpreted the same definition of 'counterfeit' [as used in the Bond] … requires a fake document that is an imitation or duplicate of a preexisting original document." *Dakota West Credit Union v. CUMIS Insurance Society, Inc*., 532 F. Supp. 2d 1110, 1115 (D.N.D. 2008) (citing cases).[7] "'Counterfeit' also means the imitation of an instrument that is authentic such that a party is deceived on the basis of the quality of the imitation." *Id*.

---

[6] Without asserting that it believed this to be true, the Bank represents that TSG's president has sworn that "Certificate No. 11 was in fact No. 2" and that "Certificate No. 11 represented Certificate No. 2." (Doc. 56 at 6, 28). He has done no such thing. Instead, the affiant testified only that "Certificate No. 11 represented *the exact shares as* No. 2, and was intended to be *the equivalent of* Certificate No. 2." (Lovelace Affidavit at 2 (emphasis added)).

[7] *See also First Federal Savings Bank v. Continental Casualty Co*., 768 F. Supp. 1449, 1456 (D. Kan. 1991); *State Bank of the Lakes v. Kansas Bankers Surety Co*., 1999 WL 674739 at *3 (N.D. Ill. 1999); *National City Bank v. St. Paul Fire & Marine Insurance Co*., 447 N.W.2d 171, 178-79 (Minn. 1989).

(citing cases).⁸ The original of Certificate No. 2 is an underlying genuine document, but Certificate No. 11 is not a fake version of Certificate No. 2 but rather a genuine original of Certificate No. 11, and this is so painfully obvious that Certificate No. 11 has not the slightest capacity to deceive anyone – least of all the Bank – into believing it is the original of Certificate No. 2.

The Bank concedes that a document cannot be a counterfeit under the Bond unless it "purports to be something that it is not." (Doc. 67 at 3 (internal quotes omitted)). Because Certificate No. 11 patently does not purport to be the original of Certificate No. 2, it cannot be a counterfeit under the Bond.⁹

The Bank devotes most of its attention, not to supporting its assertion that Certificate No. 11 is counterfeit, but to insisting that the defendants should not be allowed to point out the pellucid bankruptcy of its position. First, the Bank complains that the defendants did not deny that Certificate No. 11 is counterfeit until their reply brief. (Doc. 63 at 1-3). Second, the Bank argues that the defendants waived this argument, or are estopped to assert it, because they did not

---

⁸ *See also North Shore Bank v. Progressive Casualty Insurance Co.*, 674 F.3d 884, 888 n.2 (7th Cir. 2012); *Reliance Insurance Co. v. Capital Bancshares, Inc.*, 912 F.2d 756, 757 (5th Cir. 1990); *French American Banking Corp. v. Flota Mercante Grancolombiana, S.A.*, 752 F. Supp. 83, 92 (S.D.N.Y. 1990), *aff'd*, 925 F.2d 603 (2nd Cir. 1991).

⁹ It is true that the 180 shares referenced in Certificate No. 11 are the same 180 shares referenced in Certificate No. 2. But that fact only makes the subject matter of the two documents the same; it does not render the documents themselves the same document or convert Certificate No. 11 into a fake version of Certificate No. 2.

It is also true that there is a misrepresentation lurking in Certificate No. 11 – the representation that the shares represented by Certificate No. 2 had not been pledged elsewhere – but that is not a misrepresentation that Certificate No. 11 is in fact the original of Certificate No. 2. The Bond covers only the latter type of misrepresentation. *E.g., North Shore Bank*, 674 F.3d at 887 ("Earlier courts considering prior versions of the bond [i.e., the version used in the Bond] discussed the requirement that a counterfeit be not simply a fraudulent document meant to deceive, but also an imitation or duplicate of a preexisting genuine original document.") (internal quotes omitted); *accord French American Banking Corp. v. Flota Mercante Grancolombiana, S.A.*, 925 F.2d 603, 604 (2nd Cir. 1991).

mention it during the almost three years between receipt of the Bank's proof of loss and the filing of this lawsuit. (Doc. 67 at 5-6).

"District courts, including this one, ordinarily do not consider arguments raised for the first time on reply." *Samuels v. Midland Funding*, LLC, 921 F. Supp. 2d 1321, 1333 (S.D. Ala. 2013). But the qualifier – "ordinarily" – admits of exceptions. For example, when the issue goes to subject matter jurisdiction, the Court will consider an argument first raised in reply. *New Hampshire Insurance Co. v. Wiregrass Construction Co.*, 2010 WL 2038298 at *2 n.2 (S.D. Ala. 2010).

Another exception arises when the non-movant in its responsive brief for the first time articulates a theory of recovery that was not fairly disclosed by the pleadings or by other communications from the non-movant. In such a situation, the reply brief represents the movant's first opportunity to assert an argument in opposition to the newly advanced theory.

That is precisely what occurred in this case. The Bank's complaint alleges generally a loss "based on a forged or counterfeit stock certificate." (Doc. 17 at 41). The Bank's supplement to the Rule 26 report likewise speaks only of a "counterfeit stock certificate." (Doc. 38 at 1). Note in both cases the singular "certificate," which justified the defendants in concluding that only one certificate was at issue.[10] The defendants understood the alleged counterfeit stock certificate to be Certificate No. 2, (Doc. 40), and they proceeded on that basis. Their assumption was perfectly reasonable since, as discussed above, Certificate No. 2 was plausibly a counterfeit[11] while Certificate No. 11 patently was not, and they were justified in assuming that the Bank was not advancing a facially indefensible

---

[10] Indeed, since the complaint limits the Bank's claim to a single stock certificate, and since the time for amending the pleadings has long since passed, the defendants presumably could have moved successfully to foreclose the Bank from relying on Certificate No. 11 as a second counterfeit certificate.

[11] As explained in Part I.A, the defendants are entitled to summary judgment as to Certificate No. 2 not because that certificate is not a counterfeit but because other elements of coverage are unsatisfied.

argument. The Bank has throughout this litigation focused on Certificate No. 2, not Certificate No. 11, further justifying the defendants' understanding.[12] The Bank, which ignores these facts, has pointed to nothing that reasonably should have put the defendants on notice it was advancing a claim that Certificate No. 11 was counterfeit. Accordingly, the Court concludes that it is appropriate to consider the defendants' argument that Certificate No. 11 was not counterfeit.[13]

As for waiver or estoppel based on the defendants' pre-litigation failure to deny that Certificate No. 11 is counterfeit, there are at least two fatal flaws in the Bank's position. First, the Bank has not shown that it ever advised the defendants that it contends Certificate No. 11 is counterfeit and, absent such an assertion, there was nothing for the defendants to deny. Second, the Bank has offered no authority or other support for the proposition that the defendants' silence (had they been informed of the Bank's position) precludes them from challenging the Bank's position now.[14]

**II. Bad Faith.**

"[C]ontractual liability is a prerequisite for liability for bad faith. Therefore, one who cannot prove she was entitled to benefits under an insurance policy cannot recover on a bad-faith claim." *Acceptance Insurance Co. v. Brown*,

---

[12] Even its 35-page brief in opposition to the instant motion is focused almost entirely on Certificate No. 2. (Doc. 56).

[13] The Bank, which sought and received permission to file a sur-reply brief addressing this argument, has not been prejudiced by the Court's consideration of the argument.

[14] The Bank asserts (but the defendants dispute) that the defendants denied the Bank's claim years ago on the grounds there was no forgery, without considering whether there was coverage under the "counterfeit" provision. (Doc. 67 at 5). The Bank argues that the defendants, having once denied its claim on one ground (no forgery), cannot now justify their denial on another ground (no counterfeit). (Doc. 56 at 2 n.3). Their single authority actually stands only for the proposition that an insurer, having denied a claim based on non-coverage, cannot thereafter assert forfeiture. Because the defendants are not asserting forfeiture but non-coverage, the Bank's authority is inapposite.

832 So. 2d 1, 16 (Ala. 2001). The same rule applies to both normal and abnormal claims of bad faith. *State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 318 (Ala. 1999) ("[W]e make clear that in order to recover under a theory of an abnormal case of bad-faith failure to investigate an insurance claim, the insured must show … that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim."); *accord Hillery v. Allstate Indemnity Co.*, 705 F. Supp. 2d 1343, 1364 (S.D. Ala. 2010). The defendants point out this requirement, (Doc. 50 at 26), and the Bank has not responded. (Doc. 56 at 34-35). Because the Bank cannot establish a claim for breach of contract, neither can it establish a claim of bad faith.

**III. Counterclaim.**

The defendants filed a counterclaim, which seeks a declaration that they are not obligated to the Bank with respect to its claimed loss. (Doc. 21 at 15-18). One asserted ground is that the Bank did not suffer loss directly resulting from having relied in good faith on the assumed validity of Certificate No. 2. (*Id*. at 17-18). As discussed in Part I.A, the defendants are correct. Accordingly, the defendants are entitled to summary judgment on their mirror-image counterclaim.

**IV. Rule 56(h).**

The Bank argues that paragraph 4 of the affidavit of Donna Williams was submitted in bad faith and that, as a sanction under Rule 56(h), the defendants' motion for summary judgment should be denied. (Doc. 64 at 1, 7).

Rule 56(g) was amended in 2010 and reclassified as Rule 56(h). Before the amendment, sanction was mandatory upon a finding of bad faith, and the only identified sanctions were contempt and an award of expenses. Fed. R. Civ. P. 56 advisory committee notes, subdivision (h). Now, "[s]anctions are made discretionary, not mandatory, reflecting the experience that courts seldom invoke the independent Rule 56 authority to impose sanctions." *Id*. Moreover, the Court

"has wide discretion in deciding what constitutes 'bad faith.'" 10B Charles A. Wright, Arthur R. Miller &. Mary K. Kane, Federal Practice and Procedure § 2742 at 447 (3rd ed. 1998).

The Court is unpersuaded that paragraph 4 of Williams' affidavit was submitted in bad faith. Even had that paragraph been submitted in bad faith, denial of summary judgment would be an inappropriate sanction, given that paragraph 4 has absolutely no bearing on the Court's resolution of the motion for summary judgment.[15] Accordingly, the motion for relief under Rule 56(h) is **denied**.

## CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment is **granted**. The Bank's claims against the defendants are **dismissed with prejudice**. Judgment shall be entered accordingly by separate order.

DONE and ORDERED this 21st day of May, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[15] Paragraph 4 is relevant to the quality of the defendants' investigation for purposes of the Bank's bad faith claim but, as discussed in Part II, that claim fails regardless of the quality of the defendants' investigation, since the Bank is unable to establish a breach of the Bond.